IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 09-cv-0004-RBJ-MJW

THOMAS LEWIS,

      Plaintiff,

v.

DENVER FIRE DEPARMENT, et al,

      Defendants.

---

## Findings of Fact, Conclusions of Law and Order of Judgment

---

This case was tried to the Court January 7–10 and 31 and February 1, 2013. Plaintiff contends that he was demoted from his position as a Lieutenant in the Denver Fire Department because of his race, African American, and in retaliation for engaging in protected activity in violation of 42 U.S.C. §§ 1981 and 1983. The Court finds that he did not prove his claims to a preponderance of the evidence and therefore resolves the claims in favor of the defendants.

### FACTS AND CASE HISTORY

**A. Pre-EEOC Charge**.

Thomas R. Lewis is an African American firefighter who began working for the Denver Fire Department in 1982. In 1993 Mr. Lewis was promoted to Lieutenant. He was assigned to the Denver International Airport (DIA) station from 2004 until April 2009. He has been married 31 years as well and has four children, all of whom have obtained college degrees or are in college now. I mention those things because they are an indication of his character. I found much to like and admire about Mr. Lewis as an individual and a firefighter.

1

Prior to 2006 Lt. Lewis was disciplined on four separate occasions.  The most serious of those was a combination of incidents in 2001.  He was seen entering a residence that was known by Denver police to be a crack cocaine house.  After leaving the house Lt. Lewis was pulled over by Denver police for failing to stop at a stop sign.  At the time, Lt. Lewis was driving a vehicle owned by the Denver Fire Department, and there was an indication that he had been drinking.  Lt. Lewis was not cited by the Denver police officers, but the incident was reported to the Fire Department.  He received an 80-hour suspension from the Manager of Safety and did not appeal.

In 2006 Lt. Lewis got crosswise with an Assistant Fire Chief, Keith Mehrens, over a number of separate incidents.  He disputed Mehrens' decision to select a white firefighter, Steve Shideler, for an assignment that he thought should have gone to Greg Brewer, an African American who had more seniority.  He was reported to have admitted, however, that he did not feel that Mehrens' decision was motivated by race, and that he did not feel that race discrimination was being practiced by anyone in the Division.  *See* memo from Division Chief Nuanes to Lt. Lewis of November 16, 2006.  Ex. Z.  He disputed this later, as noted below.

Assistant Chief Mehrens also accused Lt. Lewis of shoving a white firefighter, Jason Cole.  After an investigation, that allegation was not sustained.  No one was disciplined.  On December 5, 2006, Lt. Lewis sang a song in the firehouse that Mehrens considered to be threatening.  Even though an investigation found that no one else felt threatened by the song, Lt. Lewis received a written reprimand from Mehrens on January 23, 2007.  Ex. BB.  Lt. Lewis' appeal from that reprimand was sustained by Nuanes.  *Id.*

### B.  EEOC Charge

Lt. Lewis contacted the Equal Employment Opportunity Commission (EEOC) in May 2007, and he informed the Denver Fire Department that he was planning to file a discrimination complaint.  In June 2007 confidential disciplinary documents from Lt. Lewis' file were left in a public place in the station house.

On July 10, 2007, Lt. Lewis filed a Charge of race discrimination and retaliation with the EEOC. Ex. 9.  He based this complaint on (1) the Department's failure to discipline Cole because of his unsupported charge that Lewis had assaulted him, and because Cole had exposed himself and made lewd comments to co-workers; (2) Mehrens' reprimand for his singing the allegedly inappropriate song in the firehouse; (3) his belief that Mehrens had made false allegations about him but had not been disciplined for it; (4) a misrepresentation made during the disciplinary process that he (Lewis) did not believe race was a factor, whereas he actually said that he did not know if it was a factor; (5) Mehrens' accusation that he had "played the race card" in connection with the Brewer/Shideler incident; and (6) threats to transfer and discharge him.  *Id.*

The EEOC issued a "right to sue" letter on December 4, 2008.

**C.  Lawsuit as Originally Filed.**

The present suit was filed on January 5, 2009.  The Complaint [docket #1] was filed against the Denver Fire Department, as a department of the City and County of Denver, and Assistant Chief Mehrens.  The focus of the original Complaint was the series of incidents involving Mehrens. Plaintiff asserted three claims for relief, all based upon allegations of race discrimination and retaliation: (1) violation of 42 U.S.C. § 1981; (2) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; and (3) violation of 42 U.S.C. § 1983.  He sought declaratory and injunctive relief, including orders to remove the written reprimand and other adverse information from his personnel file, and damages based upon emotional distress, humiliation, embarrassment and mental anguish.

The Department learned of the lawsuit on January 6, 2009.  Patrick Hynes, the Division Chief of the Airport Division, immediately issued a memo to Mehrens and Lewis informing them that because of the seriousness of the allegations, he was imposing temporary work restrictions to ensure that there would be no direct line of supervision between them, including the cancellation of any shift trades or overtime opportunities that would bring them into contact with each other.  He assured them

that they would each have equal opportunities for overtime while the restrictions were in place.  Ex.

GG.  On January 21, 2009, Fire Chief Nick Nuanes informed Lt. Lewis that because he and Assistant

Chief Mehrens were both assigned to Station 32, he was transferring Lt. Lewis to Station 31 in order

to ensure as little contact as possible between the two men while the lawsuit was pending.  He

indicated that Lt. Lewis would be assigned to the same shift and vacation selection, and that overtime

would be available at the same rate as at Station 32.  Ex. II.

### D. February 2009 Incidents.

The situation and ultimately this lawsuit changed dramatically on February 13, 2009.  On that

day Lt. Lewis, while off duty, was involved in an ugly incident in a Verizon store.  Lt. Lewis had lost

his cell phone and went to the store to obtain a replacement phone.  According to an investigator's

report prepared later, upon arriving at the store Lt. Lewis was almost immediately upset that an

employee, Ben-Ari Finegold, who was preparing to leave at the end of his shift, would not stay and

help him.  Another employee, Todd Strong, took over.  In the course of trying to help Lt. Lewis, Mr.

Strong asked whether he wished to pay his past due bill and tried to explain how Lt. Lewis' insurance

worked in terms of replacement of the lost phone.  Without cause or provocation, according to Mr.

Strong, Lt. Lewis proceeded in a loud, angry voice to call him names ("fucking pussy," "faggot,"

"sweet papa," "sweet pants," "pussies," "worthless piece of shit," "motherfucker").  Mr. Strong says

that Lt. Lewis smelled of alcohol.  Anna Bautista, the store manager, tried to help Lt. Lewis, but his

behavior continued.  According to her, he said, "if I did my job like you, your kids would be crying."

Lt. Lewis left the store but returned a short time later, apparently because he had left a credit

card there.  His behavior did not improve.  Reportedly, he began by announcing to Mr. Strong that he

would not work with him, because he was "totally worthless."  He then interrupted Ms. Bautista, who

was working with another customer, Tiffany Davis, and announced that he would work with her.  His

obnoxious behavior continued to the point that Ms. Davis, who was offended, essentially told Lt.

Lewis to knock it off.

While in the Verizon store, Lt. Lewis mentioned that he worked at the Denver Fire Department. After Lt. Lewis left the store the second time, Mr. Strong sent an email to the Fire Department complaining about Lt. Lewis' behavior. Ex. LL. Later the Denver Police Department was notified (in circumstances discussed later in this order), and a misdemeanor disturbing the peace charge was filed against Lt. Lewis.

On February 14, 2009, the day after the incident, Lt. Lewis entered an office at the firehouse and, in the presence of Captains Danny Perez and Mike Benton, engaged in bizarre, inappropriate behavior. He went into an angry rant, not directed at either Captain, during which he repeatedly and in a loud voice said something about someone having lied and that "they shouldn't have fucked with me." His behavior did not cause the Captains to be immediately fearful for their own safety, but they did think that Lt. Lewis perhaps needed help.

On the same day two officers from the Internal Affairs Office of the Fire Department were sent to the Verizon store to apologize on behalf of the Department. On the following day Division Chief Hynes placed Lt. Lewis on administrative leave, with pay, pending an internal investigation of his actions on and around February 13.

The ultimate responsibility within the Fire Department for review of a serious incident and the imposition of discipline lies with the Fire Chief. However, Chief Nuanes almost immediately delegated that responsibility with respect to Lt. Lewis to Deputy Chief Rex King, because he believed that Lewis harbored animosity towards him. King took over on or about February 15, 2009, the day that Lt. Lewis was placed on leave.

The decision was made, under Deputy Chief King's authority, to hire a neutral third party to investigate the February 13 and 14, 2009 incidents rather than the Internal Affairs Office. The Mountain States Employers Council was hired for that purpose, and Jody Luna conducted the initial investigation.

Ms. Luna interviewed Lt. Lewis; Verizon employees Ben-Ari Finegold, Todd Strong and Anna Bautista (the store manager); the customer who was in the store, Tiffany Davis; and Captains Perez and Benton.   In her report issued on March 4, 2009, ex. NN, she found the store employees' and the customer's statements to have been credible, and that the facts were as stated above.   She reported that Lt. Lewis acknowledged that he probably had been rude to a male employee; that he might have called him names; and that he had had a couple of beers before going to the store. However, he told her that he had maintained a conversational tone of voice, and he denied much of what the employees and the customer had reported, including several of the vulgar names he was accused of having used.   Ms. Luna found that Lt. Lewis' denials and his overall account of the incident were not credible.   Based on Lt. Lewis' indication that he did not recall encounters with Finegold or Davis, Ms. Luna speculated that he might have been more under the influence of alcohol than he acknowledged.   As for the incident involving Captains Perez and Benton, Lt. Lewis essentially denied being angry that morning or making the statements attributed to him.   Ms. Luna found those denials also to be incredible.

### E.  The Lawsuit Evolves.

On April 14, 2009, plaintiff filed his first "Amended Complaint" in this case [#17].   Among other things the Amended Complaint added Fire Chief Nuanes as a defendant, asserting that he was responsible for the work restrictions and transfer to Station 31 that were implemented in January; the decision to place him on administrative leave in February; the hiring of Mountain States to conduct the investigation of the February incidents; and Mountain States' alleged refusal to permit him to have an attorney present when he was interviewed.   These actions, he alleged, were discriminatory and retaliatory based on his race.

On the same day, April 14, 2009, Deputy Chief King approved a Contemplation of Disciplinary Action notice to Lt. Lewis.   Ex. OO.   This was a written notice of possible discipline and that a pre-disciplinary meeting would be held on April 23, 2009, at which time Lt. Lewis could

be represented by a person of his choosing and could present any verbal and written statements in response.  The notice indicated that discipline was being considered based upon (1) the February 13, 2009 Verizon store incident; several details concerning the name-calling and other behaviors were listed; (2) Lt. Lewis' behavior and statements in the firehouse with two superior officers on February 14, 2009; (3) departures from the truth, i.e., his denials and minimization of his behavior during those incidents when he was interviewed by the Mountain States investigator; and (4) a pattern of being rude to, intimidating and threatening people, evidenced by his behaviors on February 13 and 14, 2009, but also by the fact that "[o]ver the past four years, at least six firefighters have requested and received transfers from under your supervision because of your threatening, intimidating, and rude behavior towards them."

The notice cited excerpts from City Executive Order 112 (concerning violence in the workplace but defined to include actual or attempted threatening behavior, verbal abuse, intimidation, harassment and swearing or shouting at, whether on or off duty), and the Fire Department's Code of Conduct (requiring employees to conduct themselves to reflect credit on the Department; requiring supervisors to manage in an effective, considerate and fair manner; and requiring all personnel to refrain from engaging in intimidating, threatening or hostile behaviors from departing from the truth).  The notice also listed his previous disciplinary history (seven items between 1989 and 2007); and special commendations he had received in 1990, 1992, and 2006.

The pre-disciplinary meeting was held as scheduled on April 23, 2009.  Deputy Chief King presided.  Also present, among others, were Division Chief Hynes and Lt. Diaz.  The 28-page transcript of the recorded meeting is exhibit QQ.  Lt. Lewis indicated that his mother had been quite ill and possibly dying; that he had spent the day of February 13, 2009 watching her; and that he was under stress as a result.  He admitted that he "probably drank a beer" before he went to the store.  *Id.* at 5.  He said that when he went to the store to get a replacement for a phone he had lost, he was told that he owed $141 for two unpaid months of charges for his cell phone plus $50 to replace it.  He

believed, and said, that the $50 was "fuckin' bullshit." *Id.* He denied calling Mr. Strong a "faggot." *Id.* However, he admitted that he cursed, and that he did not conduct himself in a manner that reflected credit on the Department. He acknowledged that he told Ms. Bautista that he worked for the Denver Fire Department, and that [i]f I did my job the way you did your job, you'd cry like a little girl." *Id.* at 6. He also acknowledged asking her, when he returned to the store, whether they put any charges on the card in his absence. Lt. Lewis said that when it was all over and he was sitting in his car, he realized that he should not have taken his frustrations out on the store personnel.

Lt. Lewis largely disputed the description of his behavior on February 14. He denied yelling, screaming or acting in a deranged or erratic manner. He said that someone had made a reference to something that was going on in his case and he said, "he [referring to Keith Mehrens] lied and I can prove that he lied." *Id.* at 9. He did not call him a "motherfucker," and he did not say, "they shouldn't have fucked with me." He questioned the credibility of the two Captains and why the other twenty-one people in the station had not been interviewed. He said that "Mike" (apparently meaning Captain Benton) "historically always blamed things on me that I didn't do." *Id.* at 10.

Lt. Lewis denied that he departed from the truth or that he denied most of the misconduct during his interview by the Mountain States investigator. Rather, "I've been as honest as I can about everything that's gone on. *Id.* R 21.

As for the statement in the notice that six firefighters had requested and received transfers because of his threatening and intimidating behavior, he called it "an outright lie." *Id.* at 14. He denied the claim he did not manage in an effective, considerate and fair manner. He insisted that the contrary was the case, and "if someone can show me specific instances where I haven't done that, I'd like them to, 'cause I always do that. I've never been unfair to anyone." *Id.* at 20. Although the notice had not named the firefighters, Lt. Lewis singled out Jason Cole and said that Cole had lied when he had accused Lt. Lewis of assaulting him. The incident was investigated, and Cole's accusation had not been sustained; the Department did nothing, and Cole was transferred. He said

8

that Steve Shideler requested a transfer because he would not have to rove, not because he (Lewis) had intimidated or threatened him. He said that Juan Luevano transferred because his wife was ill, not because of any threats or intimidation. He pointed out that he had met with Chief Nuanes and Assistant Chief Kelly Caldwell about complaints about him, and he and Caldwell set up an all-day meeting where firefighters could come and voice their complaints about him. At the end of the day, Caldwell said, "I don't know what's goin' on. But I do know that racism still exists in the world. I mean, I can't see a thing you've done to them. I can't see a thing. We've gone through this and nobody can tell me anything you've done to them. You make them do their jobs." *Id.* at 19. He denied that he made any threats concerning Greg Brewer's transfer to Station 32.

After the April 23, 2009 disciplinary meeting, Deputy Chief King determined that there should be follow-up on Lt. Lewis' strong denial that he was supervising his crew ineffectively and his related comments regarding Assistant Chief Caldwell. He decided that the follow up could be handled by Internal Affairs, in part because Division Chief McMillan was not a fan of Mountain States. Captain Colley Fisher and Lt. Diaz, both assigned to the Internal Affairs Office, interviewed engineers Steven Brady and John Jonke; technicians Juan Luevano, Mark Ehrenkrook, and Jason Cole; Lts. Joseph Lucero and Steven Shideler; and Captain Thomas Gliver. The transcripts of these interviews are exhibits SS through ZZ. The crew members' comments are very negative about Lt. Lewis' management and leadership style, contrary to Lt. Lewis' statements during the pre-disciplinary meeting.

Assistant Chief Caldwell, Division Chief Hynes and Assistant Chief Charles Davis followed up with him on April 25, 2009. The meeting is summarized in Hynes' memo to Caldwell of that date. Ex. KKK. *See also* Caldwell's response clarifying the memo in some respects. Ex. LLL. Assistant Chief Caldwell acknowledged during that meeting that the level of animosity among crew members against Lt. Lewis was high, and that he thought it was a personality issue, not race based. *Id.*

On May 5, 2009, Deputy Chief King issued a Notice of Final Disciplinary Action.  Ex. AAA.  He determined that Lt. Lewis should be demoted to the rank of Firefighter 1st Grade, effective May 24, 2009, and suspended for 72 hours without pay.  He based the decision on the February 13, 2009 incident at the Verizon store; the February 14, 2009 incident at the firehouse; Lt. Lewis' denials of various specific acts of misconduct during those incidents, implicitly his departure from the truth; his failure to report a traffic citation which was discovered during a review of his criminal history and driving record; and the transfer requests of firefighters under his supervision.  Ex. AAA.  The same provisions of Executive Order 112 and the Code of Conduct were cited, as was his disciplinary history and commendations.  Essentially the final decision mimicked the contemplation of discipline document.  Deputy Chief King's decision actually was a recommendation to the Manager of Safety who had the final decision-making authority.

The Manager of Safety was Al LaCabe.  Mr. LaCabe, who is an African American, did not agree that Lt. Lewis should be suspended, and he overturned that part of Deputy Chief King's recommendation.  However, he affirmed the demotion.  He considered termination but concluded that there was no evidence that Lt. Lewis could not function at the firefighter level.  He emphasized that Lt. Lewis' rank as a lieutenant was one of the largest aggravating factors.  Mr. LaCabe's "Departmental Order of Disciplinary Action" was issued on May 19, 2009.  Ex. BBB.  On the day after Mr. LaCabe's decision, Mr. Lewis, now a Firefighter 1st Grade, was transferred to a new station.  He started there on May 29, 2009.

On July 6, 2009 plaintiff filed his Second Amended Complaint [#57].  The defendants remained the same and the complaints recited in the two previous complaints remained as well.  The major difference was that the complaint now included the demotion, which since that time and certainly at trial became the primary focus of the case.

Mr. Lewis appealed his demotion to the Civil Service Commission.  A hearing was held in August 2009.  After eight days of hearing before a hearing officer (August 24-28 and October 26-28, 2009), Mr. Lewis withdrew the appeal.  Therefore, no decision was rendered.

On December 4, 2009, plaintiff filed his Third Amended Complaint [#82], adding Division Chief Hynes as a defendant.  That, like previous versions, generated a new round of motions that kept counsel busy for the next several months.

On October 28, 2010, plaintiff filed his Fourth Amended Complaint [#118], adding Lt. Diaz as a defendant based on plaintiff's discovery in depositions that Diaz had encouraged the Verizon employees to file a police complaint against him.  Plaintiff suspected that Division Chief Hynes had put him up to it.  At this point plaintiff was asserting seven claims for relief.  Claims One through Four asserted violations of 42 U.S.C. §§ 1981 and 1983 against former Fire Chief Nick Nuanes, Assistant Chief Keith Mehrens, Division Chief Patrick Hynes, and Lt. Daniel Diaz respectively.  His Fifth Claim asserted a conspiracy between Hynes and Diaz in violation of 42 U.S.C. §§ 1983, 1985, and 1986.  The Sixth and Seventh Claims were asserted against the City and County of Denver (and, improperly, the Denver Fire Department) for violations of Sections 1981 and 1983, and of Title VII, respectively.

Defendants then moved to dismiss the Fourth Amended Complaint [##119, 121], and another round of briefing followed.  The case was reassigned, and on December 29, 2011, this Court issued an order (1) dismissing Claims One through Three against defendants Nuanes, Hynes and Mehrens on qualified immunity grounds, and (2) sua sponte dismissing the Fifth Claim that had asserted a conspiracy by Hynes and Diaz.  [#145].  Several more months of skirmishing followed, including the filing and briefing of defendants' motion for summary judgment.  On January 2, 2013, the Court granted that motion in part, dismissing the Sixth Claim insofar as it attempted to sue the Denver Fire Department and dismissing the Seventh Claim asserted under Title VII.  Therefore, what was remaining for trial were (1) the Fourth Claim, asserting section 1981 and 1983 claims against Lt.

Daniel Diaz and (2) the Sixth Claim, asserting section 1981 and 1983 claims against the City and County of Denver.

**F.  Trial.**

The evidence at trial can be divided into two broad parts, one aimed at establishing a custom or practice of the Denver Fire Depart to discipline African American firefighters more harshly than others, and the other pertaining to the discrimination and retaliation claims specific to Mr. Lewis.

1.  Custom and Practice Evidence.

The first witness in the trial was Charles McMillan who retired in 2010 as the Division Chief in Charge of Administration.  A Division Chief ranks just below the Fire Chief and the Deputy Fire Chief in the organizational structure of the Department.  The Administration Division includes Internal Investigations, sometimes called Internal Affairs Bureau or the Internal Affairs Office, which conducts investigations of complaints about the Department's own personnel.  Mr. McMillan is an African American gentleman.

Mr. McMillan testified that there was racial tension in the Denver Fire Department during his 35 years there.  As he put it, "we" came in because of a consent decree.  We were entering an all-white atmosphere and were not wanted.  He says that the Department has made attempts to address the issue, but it continued throughout his career.  He said that African Americans were not the only ones.  Other "minorities" and women had similar experiences.

Based upon his experience, and his examination of plaintiff's exhibit 4, he believes that discipline for African Americans tends to be stiffer than for others.  Exhibit 4 includes a chart prepared by plaintiff's counsel that purports to be a chronological summary of all discipline meted out between May 30, 2000 and August 25, 2011, in which the name of the firefighter, race, conduct (if known) and discipline are listed.  At counsel's request Mr. McMillan reviewed the summary and, based on his personal knowledge of the races of the individuals listed, he noted certain errors.  He

testified that he did not find other errors in the chart.  He believes that Lt. Lewis' discipline was harsher than that of some Caucasian officers in similar situations.

A number of current African American firefighters also provided background testimony. Captain Anthony Martin, a 21-year veteran of the Department, is the current President of the Colorado Black Professional Firefighters and a member of the Finance Committee of Firefighters Incorporated for Racial Equality or "FIRE."  He too indicated that there is racial tension in the Department.  He cited as an example, as did others, a "hangman's noose" that was found in the Rocky Mountain Fire Academy in 2009.  Greg Brewer, a firefighter with 14 years' experience, testified that he believes that black firefighters are disciplined more harshly than people of color, and he provided examples.  Quentin Schamber and Lt. Harold Johnson were others.  To a man these witnesses were impressive and credible.

Plaintiff's summary chart, however, must be viewed with some caution.  The conduct that gave rise to the discipline in each case is frequently noted as "unknown."  Where it is not indicated to be unknown, the conduct is described with just a few vague words such as "hostile work environment," "conduct unbecoming with crew," "failure to follow department directive," etc.  One would have to study the details of each incident to make any kind of conclusive comparison.

Plaintiff did attempt to provide a few detailed examples, most notably the discipline imposed on Lt. Dennis Horton, a Caucasian who ordered Mr. Schamber to stand immediately in front of a fire truck and then blew the siren, causing permanent hearing loss.  He was suspended for five 24-hour shifts but allowed to cover the suspension with vacation time, and he was transferred to another station when Mr. Schamber returned to work.  Plaintiff and others viewed that discipline as mild in comparison to that imposed on various African Americans, including the plaintiff.  I agree.  On the other hand, the final disciplinary decision in Lt. Horton's case was made by Manager of Safety LaCabe who testified that he considered demotion and termination but decided that those sanctions

were too harsh in consideration of Lt. Horton's 27 years in the Department with no previous discipline and his acceptance of full responsibility for what he did.

I also note that Mr. LaCabe testified that he never received a complaint during the nearly seven years that he served as Manager of Safety (August 2003 to June 2010) that African Americans were more harshly disciplined than others. Nevertheless, it is fair to say that among the African American firefighters who testified at trial there is a perception that African Americans have historically been more harshly disciplined on average than others. Based on the totality of the evidence presented I am inclined to agree with their perception. I was encouraged by the testimony of Lt. Johnson who believes that the Department is making great strides towards better diversity under the administration of the current Fire Chief, Eric Tade (a Caucasian).

     2.  <u>Evidence Concerning Lt. Lewis.</u>

*The 2006-2007 Incidents*

The events concerning Assistant Chief Mehrens that gave rise to the EEOC Charge and the original complaint in this case received little attention at trial. The only part of the written reprimand that Lt. Lewis received from Assistant Chief Mehrens that was upheld was the singing of an inappropriate song. That song, which Lt. Lewis was singing in the firehouse on December 5, 2006, could be taken as threatening, including the words, "if you don't stop messing with me and leave me alone I'll bring a gun to work and finish it." *See* ex. 5. In a memo to Deputy Fire Chief James Sestrich dated March 6, 2007, Captain Heiss and Lt. Montez, who apparently conducted the investigation, wrote that "[w]e have obtained a copy of the song in question and without a doubt the song was inappropriate for use in a business setting." Ex. 6.

I note that Greg Brewer, who was the individual who Lt. Lewis believes was wrongly denied an assignment by Assistant Chief Mehrens in 2006, testified that he did not believe that he ever has experienced racial prejudice at the Denver Fire Department. Mr. Sestrich, who later became Fire Chief and is now retired, testified that the whole episode was a "1" on a scale of "10," with a 10

being a very serious incident.  He says that it probably would have been a verbal reprimand but for the fact that Lt. Lewis was an officer.  I note, too, that in its summary judgment order, the Court determined that the reprimand was not an "adverse employment action" for purposes of a Title VII claim.  Order [#257] at 6.  In any event, no evidence was presented that the 2006 and 2007 incidents were motivated by Lt. Lewis' race.

*January 2009 Work Restrictions*

Likewise, no persuasive evidence was presented that suggested that race or retaliation motivated the work restrictions imposed by Division Chief Hynes shortly after the lawsuit was filed.  The restrictions were, of course, related to the lawsuit.  The suit as originally filed focused on Assistant Chief Mehrens, and the work restrictions and Lt. Lewis' transfer in January 2009 were said to be done to limit the likelihood that Mehrens and Lewis would work together until the matter was settled.  Mr. Lewis testified that he thinks he might have lost one day of overtime because of the restrictions.  Even that was uncertain, and in any event, the Court finds that the work restrictions were reasonable.

*Verizon Store Incident.*

Mr. Strong, Ms. Bautista, and Ms. Davis (now Ms. Roath-Taylor) each testified during the trial.  Their testimony was consistent with the statements attributed to them by Ms. Luna.  The Court finds that their testimony was credible based upon the overall consistency of their statements, their lack of a motive to lie, and their manner and demeanor on the stand.  I do note that Lt. Lewis later filed a lawsuit against Mr. Strong and Verizon.  He said that he did this because Strong had called his employer.  Details of the claims and the ultimate resolution of the suit either were not provided or not recorded in my notes or recollection from the trial.  I will simply say that this fact did not persuade me that Mr. Strong's trial testimony was other than entirely truthful.

Mr. Lewis acknowledged that his conduct at the Verizon store was "horrible," and stated that he had no excuses.  His trial testimony represented, in my mind, a more honest and remorseful

version of the incident than his statements to the Mountain States investigator and during his pre-disciplinary meeting on April 23, 2009.  He acknowledged that he had not been entirely truthful on those occasions because he was trying to save his job.  While I appreciated his candor, at the same time it tended to corroborate the Department's finding of departure from the truth.  His various versions of how much beer he had consumed before going to the store were also troublesome.  He told Ms. Luna "a couple of beers."  During the pre-disciplinary meeting he said "a beer."  In a deposition given in his lawsuit against Mr. Strong he swore that he had had no beers at all.  At trial he said one 16-ounce beer at one time and a couple of beers another time.  The number of beers he consumed is a relatively minor detail.  His credibility is not.

*Police Charge*

An event that occurred immediately following the Verizon incident, and that caused plaintiff to add Lt. Diaz to this lawsuit, received considerable attention from the plaintiff at trial.  Before Division Chief McMillan learned that Mountain States would conduct the initial investigation, he assigned Lt. Diaz and another Internal Affairs officer to go to the Verizon store to apologize and to begin the investigation.[1]  Ms. Bautista testified at trial that two or three officers from the Fire Department did come to the store and apologized.  One of them asked her whether she wanted to file a complaint against Lt. Lewis with the Denver Police Department.  Mr. Strong testified that he spoke to Lt. Diaz on the phone once or twice on the day after the incident.  By then Diaz knew and told Strong that he was being taken off the case.  Nevertheless, he requested that Strong call the police.  Diaz told him that it "would help their case."

Lt. Diaz denied this.  He testified that Ms. Bautista told him that she had called the police, but that they had not shown up, and he simply offered to call them for her.  He did call, and the Denver

---

[1] Fire Chief Nuanes testified that he too went to the store to apologize on behalf of the Department.

Police Department dispatched officer Michael Nuanes.[2]  Officer Nuanes testified that an Internal

Affairs investigator from the Fire Department (Diaz) told him that he should press charges against Lt.

Lewis.  He responded that he would make his own decisions.  Officer Nuanes ultimately did file a

complaint, but he said, credibly, that he did so based solely on the employees' statements.

The odd saga of Lt. Diaz's efforts to persuade the Verizon employees to file a police

complaint is disturbing.  His denial was not credible in the face of credible testimony by Ms.

Bautista, Mr. Strong and Officer Nuanes.  It gives the appearance that Lt. Diaz, at least, was "out to

get" Lt. Lewis.  Whether Lt. Diaz was motivated by race or by Lt. Lewis' filing of a race-based

lawsuit is a different issue.  I note that Division Chief McMillan testified that during the three years

he supervised Lt. Diaz he saw nothing that indicated that he was prejudiced against African

Americans.  In any event, especially because it turned out that Lt. Diaz' role in the investigation was

not over at that point, this incident at a minimum caused Lt. Lewis to be skeptical of the fairness of

the investigation and essentially "added fuel to the fire."

*February 14 Incident*

Captain Kenneth ("Mike") Benton described Lt. Lewis' behavior in the office on the morning

of February 14, 2009 in much the same way that he had reported to the Mountain States investigator.

In a memo to Division Chief Hynes dated February 16, 2009, he described the incident and indicated

that Lt. Lewis was under a lot of stress and had a great deal of pent up range.  Ex.KK.  He indicated

that he did not want to "rat" on a fellow firefighter, but the behavior was too out of the norm to

ignore.  He testified that he was concerned about possible workplace violence.  He acknowledged

that he was aware of Lt. Lewis' lawsuit at the time, but he insisted that it did not influence him.

Captain Danny Perez, now retired after 35 years of service, also testified consistent with his

the statement he provided to Ms. Luna and with the trial testimony of Captain Benton.  He said that

---

[2] Michael Nuanes is Nick Nuanes' second cousin.  Plaintiff finds this to be suspicious.  However, there was no
evidence that this was more than an odd coincidence.  There definitely was no evidence that Michael Nuanes was in
any way prejudiced against Lt. Lewis.

Lt. Lewis finished by hitting his hand on the table and left to shower and to prepare for roll call.  He spoke with Lt. Lewis after roll call and asked whether he was the "motherfucker."  Lt. Lewis lowered his head into his hands, apologized, and said that he shouldn't have said that.  He added that this was the only time he saw Lt. Lewis acting inappropriately.

Lt. Lewis had little to say about the February 14 incident.  He said a firefighter had said something about his transfer.  He apparently thought that this went back to the Mehrens incidents, because Lt. Lewis explained that his comment about the "motherfucker" who lied concerned Mehrens.

*Placement on Administrative Leave*

Division Chief Hynes' memo to Lt. Lewis of February 15, 2009, exhibit JJ, speaks for itself.  He was placed on administrative leave, with pay, "pending an internal investigation of your actions on or around February 13, 2009."  *Id.*  At trial Rex King testified that this was his decision, because he felt Lt. Lewis was under a lot of pressure.  He determined that it would be with full pay.

*Mountain States Investigation*

Mr. King testified that this was done because he and Chief Nuanes felt it would be better to bring in a third party investigator because the Department was involved in a lawsuit with Lt. Lewis.  Investigator Jody Luna testified about the process of the investigation, her findings and conclusions.  Her testimony was consistent with her report.  There was no suggestion by Mr. Lewis or otherwise that her investigation was in any way motivated by race or retaliation.

*Lt. Lewis' Crew*

Several of these firefighters (Luevano, Jonke, Ehrenkrook, and Brady) testified at trial.  Technician Luevano (whom Lt. Lewis described as a "good guy," ex. QQ at 17), described Lt. Lewis' management style as controlling ("my way or the highway") and sometimes rude.  He described an incident where Lt. Lewis was screaming at the rest of the team in the presence of civilians, which made him very upset.  He didn't trust Lt. Lewis' judgment in the event that

something really bad happened.  He knew that the rest of the crew harbored hostility towards Lt. Lewis when he arrived on that shift, and he thought he could turn things around.  He eventually realized he couldn't.  He requested a transfer out of Lt. Lewis' shift because "all his crew was moving," and he was not comfortable with Lt. Lewis as his supervisor.  "Sooner or later there would be problems," and he didn't want to be left there alone.  He said that he would never go back to C Shift because there might be a chance that Lt. Lewis would be back in charge.

Engineer Jonke, who had loved working for the Department, was generally as unhappy as possible while he worked under Lt. Lewis.  It seems to have started with a statement that he attributed to Lt. Lewis to the effect that he wouldn't walk across the street with him if he wasn't getting paid.  He said that Lt. Lewis did not have a management style and was not receptive to suggestions.  He was always on the edge of anger and had a short fuse, although the only person he saw Lt. Lewis yell at was Jason Cole.  He considered him to be a bad lieutenant.  He requested a transfer in 2006, the first time in his then 18-year career that he had done so.  There were no openings at that time.  Altogether he requested a transfer three times, which is the maximum allowed.  His request finally was approved, but he rescinded it just before he was about to be transferred because he learned that Lt. Lewis was going to a different firehouse.  Now, he claims, he is back to enjoying his job.

Technician Ehrenkrook testified that one reason that he transferred was that there was a lot of drama at Station 32, and he did not enjoy working with Lt. Lewis.  Engineer Brady testified that Lt. Lewis gets very loud and repeats himself when he is upset.  He tried to transfer a year before his transfer was approved, because he was not getting along with Lt. Lewis and did not like working with him.  He spent a long of time in his room to avoid Lt. Lewis.  Lt. Lewis tried, unsuccessfully, to intimidate him.

The feelings of the crew members were apparently known in the firehouse.  Captain Benton, for example, testified that "it's a real sign of trouble if everyone on your shift wants to transfer."

Assistant Fire Chief Kelly Caldwell acknowledged that he was aware that crew members complained about Lt. Lewis.  In fairness, however, Assistant Chief Caldwell also testified that he supervised Lt. Lewis several times, and he never had problems with him.  He performed the duties of a lieutenant satisfactorily.  He never saw him abuse, intimidate, or threaten crew members.  The only specific complaint from a firefighter about Lt. Lewis of which he became aware was made by Jason Cole, and it was not substantiated.  He considered the issues between Lt. Lewis and his crew to be "no more than normal."

Overall, the Court interpreted Assistant Chief Caldwell's testimony as being generally supportive of Lt. Lewis and his management ability.  However, Assistant Chief Caldwell testified at trial, as he had indicated to Division Chief Hynes on April 25, 2009, that he did not believe Lt. Lewis was demoted because of his race or retaliation.  He added that Deputy Chief King was a good friend of Lt. Lewis, and if he recommended demotion, there is no way that he would have been motivated by race or by retaliation for a lawsuit.

*Deputy Chief King*

Deputy Chief King was an Assistant Fire Chief at the time of the trial, but I will refer to him as "Deputy Chief," which was his position in 2009 when he made the demotion recommendation. He testified that he reviewed the Mountain States report, the statements of Captains Benton and Perez, the statements from the crew members, and Lt. Lewis' disciplinary history.  He received Division Chief Hynes' memo on the follow up with Kelly Caldwell and followed up further by conferring with Caldwell.  He sought and received advice from Division Chief McMillan, who did not favor demotion; Division Chief Hynes, who felt it was appropriate; and (without identifying that he was asking about Lt. Lewis) another chief, Charles Stewart.

He listed five bases of his decision: (1) the Verizon incident, which he considered to be a major violation of the Code of Conduct; (2) Lt. Lewis' behavior with Captains Benton and Perez, also a major violation, not because of curse words which are common in a firehouse, but because the

behavior was very abnormal; (3) the statements of the several firefighters who were interviewed, which contributed to his conclusion that Lt. Lewis was "badge heavy" and "overbearing;" (4) Lt. Lewis' past disciplinary record; and (5) departures from the truth which he gleaned from his denials of the statements of Verizon employees and the two Captains.

He concluded that Lt. Lewis had used poor judgment, and that he had not managed in an effective or fair manner. Accordingly, he was "not fit to lead." He added that it was the hardest decision he had made during his 34-year career in the Fire Department, because of his personal relationship with Lt. Lewis. He has counseled with Lt. Lewis, now firefighter Lewis, about "getting his bars back," and he told him that he would work with him and try to help him get there. He testified that race and the lawsuit "absolutely" played no role in the decision.

Under cross-examination, Mr. King elaborated somewhat. The most significant among the reasons for his decision were Lt. Lewis' past disciplinary record, his ineffective leadership and the Verizon incident. As for the past disciplinary record, only one incident affected his decision. This was the 2001 incident when Lt. Lewis drove a department vehicle while drinking, visited a known crack house, and was not cooperative with police. The drinking while driving part of it was itself a terminable offense, but Lt. Lewis admitted the facts and was given a second chance at that time.

Plaintiffs' counsel and Mr. Lewis complained that he did not have an opportunity to respond to the interviews that were done after the pre-disciplinary meeting. Deputy Chief King testified that if Internal Affairs did not obtain a response from him, "then something went wrong." I note, however, that the Department's procedures do permit the Fire Chief, here the Deputy Chief acting on delegated authority, to initiate a further investigation after hearing the employee's side of the story. Ex. 23. In any event, Mr. King testified that he would have made the same decision even without the co-worker interviews. He added that even if Lt. Lewis had responded to and disagreed with the crew's statements, it would not have made a difference. The Court finds that testimony, like all of

Mr. King's testimony, to be credible.  The crew members' comments were consistent, adamant and unequivocal.  Even at trial Lt. Lewis provided little contradictory information.

The Verizon incident was obviously very significant.  The February 14, 2009 incident with Captains Benton and Perez was a lesser factor.  Mr. King testified that if he had only had the Verizon incident and the past discipline, but not the Benton/Perry incident and the interviews of the crew, he would have had more flexibility, although still there is a very good chance he would have reached the same decision.  However, when all the incidents and facts were considered and compounded, it made the decision clearer.

Mr. King added that another factor was that he wanted to save Lt. Lewis' job.  The idea of termination had been floated, and he perceived that there were strong leanings in that direction.  He testified that Lt. Lewis "absolutely" could have been terminated for this conduct.  He acknowledged that the investigation was conducted by others.  However, he did not believe that any of the subordinates who were involved in the investigation had a problem with Lt. Lewis because of his race.

*Manager of Safety McCabe*

The decision to demote Lt. Lewis was affirmed, after extensive review, by the Manager of Safety Al LaCabe.  He testified that he was satisfied with the Mountain States investigation.  He described the incident as one of the most outrageous cases of discourtesy that he ever saw; and in response to a question from the Court, he ranked the incident as a "10" on a scale of "10" in importance to his decision.  He perceived that Lt. Lewis downplayed the incident and was not truthful.  He also perceived that Lt. Lewis made consciously false statements during the April 23, 2009 disciplinary meeting, based on his review of the transcript.  He considered the bizarre behavior with Captains Benton and Perez and the 2001 disciplinary incident also to be "10's."

He was concerned about the number of firefighters who requested transfers, noting that the actions of which they complained were somewhat similar to Lt. Lewis' actions in the Verizon store.

He was aware of Kelly Caldwell's belief that Lt. Lewis was doing a satisfactory job, and he considered whether a bunch of guys had ganged up on him. Ultimately he did not think so, and he ranked their statements as an "8" out of "10" in significance to his decision.

Mr. LaCabe was aware at the time of Lt. Lewis' lawsuit because he had read about it in the paper, and he also knew of Lt. Lewis' EEOC complaint. He insisted that those things were not factors in his decision. He mentioned that he had also demoted Caucasian officers. He did call the Denver Fire Department "a white man's world," and he had that in his mind when he reviewed this case. But nothing indicated to him that either the investigation or the recommendation that came to him was the result of racism.

I found Mr. LaCabe's explanation of his reasons for determining that demotion to be appropriate and his denial that race or retaliation had anything to do with it to be credible. He had sound reasons, and by his manner and demeanor on the stand, as well as his history of trying to promote the hiring of African Americans in the Denver Fire Department, Mr. LaCabe impressed me as an individual who was not at all influenced by bias or prejudice.

*Transfer to New Station*

During his trial testimony Mr. Lewis commented that he had fewer overtime opportunities at the station to which he was transferred after his demotion than he had had at DIA. He did not, however, present any evidence that the transfer was motivated by racial discrimination or retaliation.

## CONCLUSIONS OF LAW

Employment discrimination claims based on race may be brought under 42 U.S.C. § 1981, which guarantees to all persons the same right to make and enforce contracts as is enjoyed by white citizens, and under 42 U.S.C. § 1983, which prohibits persons acting under color of state law from depriving any citizen of the rights and privileges secured by the Constitution and laws of the United States. Under both statutes plaintiff must prove (1) membership in a protected class, (2) an adverse

23

employment action, and (3) disparate treatment among similarly situated employees.  *Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

Generally, for discriminatory employment practices of municipal officials, such as officers of the Denver Fire Department, to create liability for the municipality, the plaintiff must show that the employee acted pursuant to a policy or custom of discriminatory employment practices.  *Id.  See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690 (1978).  The existence of a policy or custom can be established by demonstrating the existence of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.  *Bryson v. City of Oklahoma City*, 627 F.3d 784 (10th Cir. 2010).

With respect to his Fourth Claim, asserted against Lt. Diaz individually, plaintiff produced evidence from which an inference can be drawn that his effort to generate a police complaint over the Verizon incident was in retaliation for something, possibly Lt. Lewis' filing of his complaint a month and a half earlier.  He told Mr. Strong that a police charge would "help their case," and he assisted Ms. Bautista in contacting the Denver Police Department.  One problem with this theory, to borrow from tort law, is that there was an "intervening cause."  Officer Nuanes determined that he had probable cause to file a disturbing the peace complaint based on the employees' statements, not Lt. Diaz' encouragement.  A more basic problem with the claim against Lt. Diaz is that the decision to demote Lt. Lewis was made between Deputy Chief King and Manager of Safety McCabe.  For reasons discussed below, I find that Lt. Diaz' input had essentially nothing to do with it.

As for the Sixth Claim, asserted against the City and County of Denver, the plaintiff attempted to establish a policy, practice, or custom that would create municipal liability in two ways: first, that there was a practice in the Denver Fire Department of imposing harsher discipline on African American firefighters than others; and second, that the decision to demote Lt. Lewis was made and ratified by officials with final decision-making authority.

As discussed above, plaintiff presented evidence in support of his contention that African Americans have historically suffered harsher discipline in the Fire Department than others.  Had he established that the discipline imposed on him was the result of racially motivated discrimination or retaliation by Fire Department officials, this Court would have found that the City and County of Denver was liable for it.  There is no place in this City or this country for a Fire Department that remains a "white man's world."

For liability to attach in this case, however, it must be shown that the historical tendency had some impact on the discipline imposed on Lt. Lewis.  That was not established.  The decision to demote Lt. Lewis was recommended by Deputy Chief Rex King and ratified by Manager of Safety Al LaCabe.  No one who was asked during the trial described Mr. King as an individual who would discriminate against anyone on the basis of race.  On the contrary, Mr. Lewis himself testified that he does not believe that Mr. King recommended demotion because of Lewis' race or his lawsuit.  Mr. King appears to have been universally respected for his fairness and lack of racial bias.  Four Fire Department officials were named as defendants in this case.  Mr. King was not.  He was a friend and a supporter of Mr. Lewis.  According to his testimony, which I found to be entirely credible, he still is.  He concluded that he had good and sufficient grounds for making "the hardest decision I have ever had to make."  It is absolutely clear to me that Deputy Chief King's recommendation was not in any way motivated by race or retaliation.

The fact that Al LaCabe is an African American does not foreclose the possibility of racial discrimination.  But no one suggested that Mr. LaCabe was motivated in any way by racial

discrimination or by retaliation for Lt. Lewis' filing of his lawsuit. Once again, Mr. Lewis testified that he did not believe that Mr. LaCabe's decision was based on race or the lawsuit. As with Deputy Chief King, the Court finds unequivocally that Mr. LaCabe did not have any improper motive or intent.

Recognizing that, plaintiff put forth a "cat's paw" theory. The term derives from an Aesop's fable wherein a monkey duped a cat into extracting roasting chestnuts from a fire and then made off with the chestnuts, leaving the cat with burnt paws but nothing else. *See Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1190 n.1 (2011). "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). The innocence of the decision-makers would not spare the employer from liability. Of course, as applied here, the subordinate's bias would have to be driven by race. *See Crowe v. ADT Security Services*, 649 F.3d 1189, 1194-95 (10th Cir. 2011). If so, the biased subordinate might also be individually liable for causing the employer to discriminate or retaliate against another employee. *See, e.g.*, *Smith v. Bray*, 681 F.3d 888, 898-99 (5th Cir. 2012). *See also Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005).

Thus, plaintiff's claim in the end is that subordinates who were motivated by racial or retaliatory bias presented an investigatory package to Deputy Chief King. King, while himself lacking in any discriminatory or retaliatory motive, did not conduct an independent investigation. Rather, he based his decision on the results of an investigation conducted by biased or prejudiced subordinates. I understand the theory, but the facts do not support its application here for several reasons.

In the first place, plaintiff did not prove, to a preponderance of the evidence, that any of the personnel involved in the investigation that led to the demotion were acting based on Lt. Lewis' race.

Defendants Mehrens and Nuanes were not involved in the process.  Division Chief Hynes was involved to some extent, but no evidence of any racial prejudice or retaliatory bias on his part was presented.  There was, as indicated, evidence that Lt. Diaz encouraged the Verizon employees to press charges with the police "to help their (apparently meaning the Fire Department's) case."  Even if one could reasonably draw the inference from this slender foundation that this reflected retaliation against Lt. Lewis for the filing of a race-based lawsuit against the Department, there is no evidence that Lt. Diaz had any significant influence on the ultimate decision.  After his initial conversations with the store employees, he did not surface again—so far as the evidence disclosed—until he and another Internal Affairs officer, Colley Fisher, were asked to interview the members of Lt. Lewis' crew.  The interviews were recorded, and the recordings were admitted in evidence.  I have reviewed them and find no indication that they were contaminated by racial bias or retaliation by either Lt. Diaz or by the crew members.  Moreover, the trial testimony of the crew members, which I found to be credible, was consistent with their interviews.

Second, Deputy Chief King's recommendation and Manager of Safety LaCabe's final decision were based on solid, largely indisputable facts.  Lt. Lewis' behavior during the Verizon incident was atrocious and plainly violated rules and regulations applicable to him.  The incident was investigated and verified by an independent investigator whose ability and good faith have not been challenged.  The investigator found, and Mr. Lewis has since admitted, that he departed from the truth in his statements and testimony about some aspects of the incident.  The description of his bizarre and inappropriate behavior in the firehouse the next day was provided by two Captains whose motives were not questioned and whom the independent investigator found to be credible.  The statements and testimony of crew members, taken as a whole, reflect their strong belief, based on their experience, that Lt. Lewis lacked leadership skill and was unpleasant to be around.  The prior disciplinary history, including the 2001 incident, stands as fact in the Department's records.

Third, and most importantly, I am utterly unconvinced that either Deputy Chief King or Manager of Safety LaCabe was duped by biased subordinates into making their decisions. Quite frankly, based on my observation of their testimony at trial, I seriously doubt that either man is capable of being duped or misled into inadvertently making a decision as significant as this one on a racial or retaliatory basis.

Mr. King took this responsibility extraordinarily seriously. This was no rubber stamp. It was a gut-wrenching decision based on his view of all the evidence available to him and his exercise of judgment. Mr. LaCabe also took the matter very seriously and was able to articulate good reasons for his final decision, including his decision to eliminate the 72-hour suspension that Deputy Chief King had recommended. He listed a number of positive qualities that he attributes to Mr. Lewis. However, he remains convinced that demotion was not too harsh. He summed it up by indicating that the Department "had to have the right people in supervising positions." Mr. LaCabe is a lawyer and is familiar with the "cat's paw" concept. In response to a question from the Court, he testified that he saw nothing in the file that led him to the conclusion that it had any application here.

In short, while this Court has concerns about the Denver Fire Department's treatment of African American firefighters, it concludes that plaintiff's claims were not proven in this case.

## ORDER

For the foregoing reasons, the Court enters its final judgment in favor of the defendants, the City and County of Denver and Daniel Diaz, and against the plaintiff, Thomas R. Lewis. This civil action and all remaining claims are dismissed with prejudice. As the prevailing parties, defendants are awarded their reasonable costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 19th day of March, 2013.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge